UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| IN RE:<br><br>VITAL PHARMACEUTICALS, INC., *et al.*,<br><br>            Debtors.[1] | Chapter 11 Case<br><br>Case No. 22-17842 (PDR)<br><br>(Jointly Administered) |
| VITAL PHARMACEUTICALS, INC., *et al.*<br><br>            Plaintiffs,<br><br>v.<br><br>JOHN H. OWOC and ENTOURAGE IP<br>HOLDINGS, LLC,<br><br>            Defendants. | Adv. Pro. No 23-01125 (PDR) |

## MOTION TO INTERVENE BY BLAST ASSET ACQUISITION LLC

Blast Asset Acquisition LLC ("Blast"), by and through its undersigned counsel, hereby respectfully moves (the "Motion") the Court pursuant to Rule 24 of the Federal Rules of Civil Procedure (the "Civil Rules"), Rule 7024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and section 1109(b) of title 11 of the United States Code (the "Bankruptcy Code"), for entry of an order permitting Blast to intervene in the above-entitled adversary proceeding, and hereby states as follows:

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada. Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicom Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

## PRELIMINARY STATEMENT

1.      The Debtors in the underlying chapter 11 bankruptcy cases initiated this adversary proceeding against Entourage IP Holdings, LLC ("Entourage") and John H. Owoc (collectively, "Defendants") to obtain a declaration (along with other related relief) that certain intellectual property assets are property of the estate.  Those assets—referred to as the "Disputed Assets" in this proceeding—consist primarily of trademarks and trademark applications that Defendants claim to own.  Plaintiffs allege that the Disputed Assets actually belong to the estate because, among other reasons, they were created by Plaintiffs' employees, with Plaintiffs' resources, and for Plaintiffs' benefit.  (See Adv. ECF No. 1 ("Plaintiffs' Compl.") ¶¶ 41-57.)

2.      About two months after Plaintiffs initiated this proceeding, they completed the sale of substantially all their assets to Blast (the "Sale").  (See Bankr. ECF No. 1658.)  Blast now seeks to intervene in this action to obtain (i) a declaration that it is the rightful owner of the Disputed Assets because they were transferred to Blast in the Sale and that Defendant Entourage has no right to register the Disputed Assets, and (ii) an order directing the U.S. Patent and Trademark Office ("USPTO") to cancel Defendant Entourage's registration of the Disputed Assets.  (See Ex. A ("Intervenor's Compl.") ¶¶ 55–69.)

3.      Under Federal Rule of Civil Procedure 24(a)—as made applicable to this proceeding by Bankruptcy Rule 7024(a)(1)—Blast is entitled to intervene as a matter of right.  As numerous courts have held in analogous circumstances, where, as here, a third party claims an ownership interest in the property at issue in the proceedings, it has an unconditional right to intervene and be heard on any matter.  See, e.g., In re Sea Island Co., 2014 WL 3767431, at *2 (Bankr. S.D. Ga. July 30, 2014) (holding that an entity had an unconditional right to intervene because it had an interest in the property that was the subject of the adversary proceeding); Ruderman ex rel. Schwartz v. Washington Nat. Ins. Co., 263 F.R.D. 670, 678 (S.D. Fla. 2010)

(finding that intervenors had an interest in the action because they claimed to be owners of the property at issue).

4.      Alternatively, the Court should exercise its discretion to permit Blast to intervene pursuant to Federal Rule of Civil Procedure 24(b).  "Permissive intervention under [Rule] 24(b) is appropriate where a party's claim or defense and the main action have a question of law or fact in common and the intervention will not unduly prejudice or delay the adjudication of the rights of the original parties."  *Georgia v. U.S. Army Corps of Engineers*, 302 F.3d 1242, 1250 (11th Cir. 2002).  Here, as discussed below, numerous questions of law and fact are common to both this proceeding and the claims Blast seeks to assert.  Because this proceeding is in its earliest stages— indeed, the parties are yet to engage in significant motion practice or discovery—permissive intervention is appropriate.  *See, e.g.*, *Chiles v. Thornburgh*, 865 F.2d 1197, 1214 (11th Cir. 1989) (allowing intervention where discovery had not yet begun); *Georgia*, 302 F.3d at 1260 (finding that because the court had not yet taken any significant action by the time of the intervention motion, the existing parties would not be prejudiced).

5.      Before filing this Motion, Blast asked the parties to stipulate to Blast's intervention. Plaintiffs and the Official Committee of Unsecured Creditors (the "Committee") agreed to Blast's intervention in this case.  However, Defendants did not agree, without providing any explanation for their refusal.  Blast thus respectfully seeks an order from this Court permitting it to intervene in this proceeding and file its Complaint in Intervention ("Intervenor's Compl."), a copy of which is attached hereto as **Exhibit A**.

## BACKGROUND

6.      In June 2023, Plaintiffs initiated this adversary proceeding to assert their rights as to the Disputed Assets, which Defendants claim to own.  (*See generally* Plaintiffs' Compl.) Plaintiffs assert three claims for relief: (i) a claim for declaratory judgment that the Disputed Assets

belong to Plaintiffs; (ii) a claim seeking an order compelling Defendants to turn over the Disputed Assets to Plaintiffs pursuant to 11 U.S.C. § 541(a); and (iii) a claim seeking to establish a constructive trust over the Disputed Assets. (*Id.* ¶¶ 41-57.) Plaintiffs allege, among other things, that the Disputed Assets "were created, designed, and funded by the Debtors" and that Defendants "wrongfully usurped a corporate opportunity of the Debtors" by claiming and registering the Disputed Assets as their own. (*Id.*)

7.      On July 31, 2023—about two months after this proceeding began—the Debtors completed the sale of substantially all their assets to Blast—an acquisition vehicle affiliated with Monster Energy Company ("Monster")—pursuant to an Asset Purchase Agreement. (*See* Bankr. ECF No. 1658.) That Sale included, among other things, the Disputed Assets subject to this proceeding. (Intervenor's Compl. ¶ 2.)

8.      As is reflected in Exhibit A, Blast now seeks to intervene in this proceeding to assert claims as to the Disputed Assets. Among other things, Blast alleges that Defendants have never owned the Disputed Assets and have instead sought to fraudulently register trademarks for the Disputed Assets as part of a scheme to hide the Debtors' assets from an arbitration involving Vital Pharmaceuticals, Inc. ("VPX"), Monster, and third-party Orange Bang, Inc. (*Id.* ¶¶ 1-14, 24-54.) Blast therefore seeks (i) a declaration that the Disputed Assets were transferred to Blast in the Sale and that Defendant Entourage has no right to register the Disputed Assets, and (ii) an order directing the USPTO to cancel Defendant Entourage's registrations of the Disputed Assets pursuant to 15 U.S.C. § 1064. (*Id.* ¶¶ 55–69.)

## **ARGUMENT**

### I.      **Blast Is Entitled to Intervene as a Matter of Right**

9.      Federal Rule of Civil Procedure 24(a) provides that a "court must permit anyone to intervene" who (1) "is given an unconditional right to intervene by a federal statute;" or (2) "claims

an interest relating to the property . . . that is subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." Fed. R. Civ. P. 24(a); *see also* Fed. R. Bankr. Proc. 7024 (providing that Rule 24 "applies in adversary proceedings").  Blast is entitled to intervene as of right under both prongs of Rule 24(a).

### A.      Rule 24(a)(1) Grants Blast an Unconditional Right to Intervene

10.      To begin, a federal statute—namely, 11 U.S.C. § 1109(b)—gives any "party in interest" an unconditional right to intervene pursuant to Rule 24(a)(1).  *See In re Celotex Corp.*, 377 B.R. 345, 350 (Bankr. M.D. Fla. 2006) ("An entity's status as a 'party in interest' under § 1109(b) satisfies the standard for intervention required by Rule 24(a)(1).").  "Courts define 'party-in-interest' as an individual or an entity that has 'a stake in the outcome of the bankruptcy case.'"  *In re Sea Island Co.*, 2014 WL 3767431, at *2.  This includes anyone claiming an interest in the property that is subject to the proceeding.  *Id.* (holding that entity with an interest in the "ownership status" of a property subject to the adversary proceeding had an unconditional right to intervene).

11.      Because Blast asserts ownership over the Disputed Assets, it "has a direct pecuniary interest in the outcome of the contested matter" and is thus a party in interest.  *Id.* at *3.  Courts routinely permit intervention as of right where, as here, a party is a party in interest under Section 1109(b).  *See, e.g.*, *id.* at *2–3 (permitting entity to intervene where it claimed an interest in the property allegedly transferred to a purchaser of the Debtors' assets in bankruptcy); *In re SFD @ Hollywood, LLC*, 411 B.R. 453, 455 (Bankr. S.D. Fla. 2009) (permitting party in interest under Section 1109(b) to intervene as a matter of right); *In re Celotex Corp.*, 377 B.R. at 350 (same); *In re Caldor Corp.*, 303 F.3d 161, 169 (2d Cir. 2002) (same); *Hadar Leasing Int'l Co. v. D.H. Overmyer Telecasting Co. (In re D.H. Overmyer Telecasting Co.)*, 53 B.R. 963, 975 (N.D. Ohio 1984) (same).

12.    Accordingly, Blast is entitled to intervene pursuant to Federal Rule of Civil Procedure 24(a)(1).

**B.    Rule 24(a)(2) Grants Blast an Unconditional Right to Intervene**

13.    Federal Rule of Civil Procedure 24(a)(2) also grants Blast an unfettered right to intervene in this proceeding.  Under Rule 24(a)(2), Blast may intervene as of right if "(1) [its] application to intervene is timely; (2) [it] has an interest relating to the property or transaction which is the subject of the action; (3) [it] is so situated that the disposition of the action, as a practical matter, may impede or impair [its] ability to protect that interest; and (4) [its] interest will not be represented adequately by the existing parties to the suit."  *ManaSota-88, Inc. v. Tidwell*, 896 F.2d 1318, 1321 (11th Cir. 1990).  Each requirement is met here.

14.    *First*, Blast's intervention request is timely.  Blast seeks to intervene less than three months after it obtained its asserted ownership of the Disputed Assets and only four months after the Debtors initiated this proceeding.  To date, the parties have not engaged in any motion practice, have not exchanged any discovery materials, and have not taken any depositions.  With discovery just beginning, Blast's intervention is timely.  *See, e.g.*, *Georgia*, 302 F.3d at 1259 (finding intervention timely even though it was requested six months after the intervenor had knowledge of the litigation and "after discovery was largely complete"); *Chiles*, 865 F.2d at 1214 (holding that intervention seven months after filing of the underlying suit was timely); *see also Protective Life Ins. Co. v. Jacobs*, No. 8:22-CV-1866 (CEH) (CPT), 2023 WL 4145825, at *3 (M.D. Fla. June 23, 2023) ("And, most significantly, this action is still in an early stage, and the addition of Jacobs as a party at this point is unlikely to prejudice the existing parties.").

15.    *Second*, because Blast asserts ownership over the Disputed Assets, Blast has "an interest relating to the property . . . which is the subject of the action."  *See Nat. Res. Def. Council v. Serv.*, No. 2:16-CV-585, 2016 WL 5415127, at *3, 5 (M.D. Fla. Sept. 28, 2016) ("As the owner

of the gas and oil rights in Big Cypress, the Colliers have a significant interest in Burnett's plan to conduct a survey, which is the subject of this matter.") (citation omitted); *Ruderman ex rel. Schwartz v. Washington Nat. Ins. Co*., 263 F.R.D. 670, 678 (S.D. Fla. 2010) (finding that intervenors had an interest in the action because they claimed to be owners of the property at issue).

16.     *Third*, since Blast "claims an interest in the very property . . . that is the subject of the main action, the potential *stare decisis* effect [] suppl[ies] the practical disadvantage which warrants intervention as of right." *Chiles*, 865 F.2d at 1214.  Indeed, should the Court determine that the Disputed Assets belong to Defendants, Blast's ability to protect its asserted ownership interest in the Disputed Assets would be impeded or impaired.  *See Nat. Res. Def. Council*, 2016 WL 5415127, at *3 ("Here, the disposition of this lawsuit will impede or impair Burnett's and the Colliers' abilities to protect their interests because Burnett and the Colliers would be prevented from conducting surveys to explore their oil and mineral rights."); *Ruderman*, 263 F.R.D. at 678 (holding that proposed intervenors' interest may be impaired because their "property interest . . . is the very subject of the main action").

17.     *Finally*, Blast's interests "may be inadequate[ly]" represented by the current parties in this proceeding. *Chiles*, 865 F.2d at 1214.  "[T]he burden of making th[e] showing [of possible inadequate representation] should be treated as minimal," and Blast "should be allowed to intervene unless it is clear that [Plaintiffs] will provide adequate representation." *Id.* (citation omitted).  Here, Plaintiffs do not and cannot adequately represent Blast's asserted interests in the Disputed Assets.  Plaintiffs and Blast assert different interests in the Disputed Assets and seek different types of relief.  While Plaintiffs ask the Court to declare that the Disputed Assets belong to them (or to order Defendants to turn over those assets or to place them in a constructive trust) (*see* Plaintiffs' Compl. ¶¶ 41–57), Blast seeks a declaration that the Disputed Assets now belong

to it (as well as other relief, including an order directing the USPTO to cancel registration of certain of the Disputed Assets) (*see* Intervenor's Compl. ¶¶ 14, 55–70).

18.     The factual and legal bases for the two sets of claims are also different.  While Plaintiffs' claims are grounded in Plaintiffs' creation and design of the Disputed Asserts, as well as Defendants' usurpation of Plaintiffs' corporate opportunity (*see* Plaintiffs' Compl. ¶¶ 41–57), Blast's claims are grounded in, among other things, Defendants' fraudulent attempts to register or otherwise secure the Disputed Assets for themselves to shield VPX's assets from an arbitration involving Monster and third-party Orange Bang, Inc. (*see* Intervenor's Compl. ¶¶ 55–70).

19.     Accordingly, because Plaintiffs' and Blast's claims are independent, and seek different types of relief, Blast has more than satisfied its "minimal" burden to show that its interests may be inadequately protected absent intervention.  *Chiles*, 865 F.2d at 1214; *Alabama v. U.S. Army Corps of Engineers*, 229 F.R.D. 669, 675 (N.D. Ala. 2005) (approving intervention and finding that intervenor had "shown that its interest differs from [plaintiff's]" and that those interest were "likely [to] compete with" intervenor's interests); *Ruderman*, 263 F.R.D. at 677 ("[T]he mere existence of colorable adequacy issues satisfies Proposed Intervenors' minimal burden to show that representation of their interests 'may be' inadequate.").

20.     Accordingly, Blast is entitled to intervene pursuant to Federal Rule of Civil Procedure 24(a)(2).

## II.     Alternatively, Blast Satisfies All Requirements for Permissive Intervention

21.     Even if Blast did not have an unconditional right to intervene under Rule 24(a) (it does), the Court should permit Blast to intervene under Rule 24(b).  "Permissive intervention under [Rule] 24(b) is appropriate where a party's claim or defense and the main action have a question of law or fact in common and the intervention will not unduly prejudice or delay the adjudication of the rights of the original parties."  *Georgia*, 302 F.3d at 1250.  Where these requirements are

met, "[j]oinder is 'strongly encouraged' and the rules are construed generously 'toward entertaining the broadest possible scope of action consistent with fairness to the parties.'" *Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833, 839 (11th Cir. 2017) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966)). Both requirements are met here.

22.     *First*, there can be no doubt that Blast's claims "have a question of law or fact in common" with claims and defenses currently asserted in this proceeding. *Georgia*, 302 F.3d at 1250. These questions include, for example:  Who created the Disputed Assets?  Who used the Disputed Assets in commerce, and to what extent?  Who owns the Disputed Assets?  These and many other questions are common to both this proceeding and the claims Blast seeks to assert. *See, e.g.*, *Tia Agripina, Inc. v. Cruisers Yachts, Inc.*, No. 16-CV-62830, 2017 WL 9280110, at *3 (S.D. Fla. Sept. 21, 2017) (granting permissive intervention where intervenor's complaint shared numerous questions of fact and law in common); *Fields v. Locke Lord Bissell & Liddell LLP*, No. 1:07-CV-2984 (TWT) (CCH), 2008 WL 11336850, at *3 (N.D. Ga. July 31, 2008) (same).

23.     *Second*, Blast's intervention would not "unduly prejudice or delay the adjudication of the rights of the original parties." *Georgia*, 302 F.3d at 1250. As explained above, since Plaintiffs filed this proceeding a few months ago, the parties have not yet engaged in motion practice, exchanged discovery, or taken any depositions. In these circumstances, with discovery just beginning, Blast's intervention is appropriate and permissible. *See, e.g.*, *Chiles*, 865 F.2d at 1213 (finding no prejudice from intervention where discovery had not yet begun); *Georgia*, 302 F.3d at 1260 (finding that because the court had not yet taken any significant action by the time of the intervention motion, the existing parties would not be prejudiced); *Protective Life Ins. Co* 2023 WL 4145825, at *3 ("And, most significantly, this action is still in an early stage, and the addition of Jacobs as a party at this point is unlikely to prejudice the existing parties.").

24.    Indeed, confirming that there will be no prejudice, Plaintiffs have consented to Blast's requested intervention.  So, too, has the Committee.  And although Defendants have not consented, they have failed to provide any explanation for their refusal.

## CONCLUSION

25.    For the foregoing reasons, Blast respectfully requests that the Court grant its motion to intervene and allow it to file the Intervenor's Complaint attached hereto as **Exhibit A**.

Dated: October 26, 2023

/s/Michael I. Goldberg

**AKERMAN LLP**
Michael I. Goldberg
Florida Bar No. 886602
Eyal Berger
Florida Bar No. 11069
201 East Las Olas Boulevard, Suite 1800
Fort Lauderdale, FL 33301
T: (954) 463-2700 /F: (954) 463-2224
michael.goldberg@akerman.com
eyal.berger@akerman.com

-and-

**HUESTON HENNIGAN LLP**[2]
Allison L. Libeu (*pro hac vice pending*)
Yegor Fursevich (*pro hac vice pending*)
Stephen D. Andrews (*pro hac vice pending*)
523 W. 6th St. Unit 400
Los Angeles, CA 90014
(213) 788-4340
alibeu@hueston.com
yfursevich@hueston.com
sandrews@hueston.com

*Counsel to Blast Asset Acquisition, LLC.*

---

[2] Eyal Berger certifies that the following attorneys have applied to appear *pro hac vice* in this matter as follows: (i) Allison Libeu [Adv. ECF 14]; (ii) Yegor Fursevich [Adv. ECF 15]; and (iii) Stephen Andrews [Adv. ECF 16].

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the forgoing was served via CM/ECF

Notice of Electronic Filings to all parties registered to receive electronic noticing in this case on

October 26, 2023.

Respectfully submitted,

By: /s/ *Michael I. Goldberg*
Michael I. Goldberg, Esq.
Florida Bar No. 886602
michael.goldberg@akerman.com
**AKERMAN LLP**
201 East Las Olas Blvd., Suite 1800
Fort Lauderdale, FL 33301-2999
Tel: 954-463-2700
Fax: 954-463-2224

# **<u>EXHIBIT A</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                              Chapter 11 Cases

VITAL PHARMACEUTICALS, INC., *et al.,*              Case No. 22-17842 (PDR)
                                                    (Jointly Administered)
Debtors.**¹**

_____/

VITAL PHARMACEUTICALS, INC, *et al.*,

Plaintiffs,

                                                    Adv. Pro. No. 23-01125 (PDR)
v.

JOHN H. OWOC and ENTOURAGE IP
HOLDINGS, LLC,

Defendants.

_____/

**INTERVENOR COMPLAINT FOR DECLARATORY JUDGMENT
AND TRADEMARK CANCELLATION**

_____

Plaintiff Blast Asset Acquisition LLC ("Blast" or "Plaintiff") brings this adversary

complaint (the "Complaint") against Entourage IP Holdings, LLC ("Entourage" or

"Defendant") seeking (i) a declaration that the Disputed Assets (as defined below) are

property of Plaintiff and that Defendant has no right to register any of the Disputed Assets,

and (ii) an order directing the United States Patent and Trademark Office ("USPTO") to

---

**¹** The Debtors include (i) Vital Pharmaceuticals, Inc.; (ii) Bang Energy Canada, Inc.; (iii) JHO Intellectual Property Holdings, LLC; (iv) JHO Real Estate Investment, LLC; (v) Quash Seltzer, LLC; (vi) Rainbow Unicom Bev LLC; and (vii) Vital Pharmaceuticals International Sales, Inc.  The address of the Debtors is 1600 N. Park Drive, Weston, Florida 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicom Bev LLC (2254);  and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

6473196

cancel Defendant's registrations of any Disputed Assets pursuant to 15 U.S.C. § 1064, and state as follows:

## **NATURE OF THIS ACTION**

1.      Since 2008, the Debtors, with the help and support of non-debtor affiliates, including Entourage, marketed and sold beverages and other products to the public under the name "Bang" and using associated logos and other intellectual property. The Debtors continuously used the Bang name in connection with their business and on their products—including their flagship Bang energy drinks—such that the Bang name has become synonymous with the Debtors and their "Bang" brand.

2.      On July 31, 2023, the Debtors completed the sale (the "Sale") of substantially all the Debtors' assets (the "Purchased Assets") to Plaintiff, an acquisition vehicle affiliated with non-party Monster Energy Company ("Monster"), under an Asset Purchase Agreement dated June 28, 2023 (the "Asset Purchase Agreement").[2] The Sale included, among other things, various trademarks and other intellectual property (the "Bang Assets").

3.      Despite the Sale, Defendant claims to own the intellectual property identified in **Exhibit 1** (the "Disputed Assets"), which the Debtors had been using in their business for years and which are identical to the Bang Assets that Plaintiff obtained through the Sale. Although Entourage—a non-debtor affiliate—has been attempting to register the Disputed Assets in its own name, the network of Debtors and non-debtor affiliates, including Entourage, always functioned as an integrated business, sharing employees, office space, capital, creditors, revenue, cash management systems, operational systems, and research and

---

[2] The United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") entered an order approving the Sale on July 14, 2023 [ECF No. 1658] (the "Sale Order").

6473196

development. Thus, the Disputed Assets properly belonged to the Debtors and were included among the Purchased Assets that Plaintiff bought in the Sale.

4.      Entourage registered or has been attempting to register the Disputed Assets in its own name—rather than the Debtors' names—to hide the Disputed Assets from the Debtors' creditors, specifically Monster and Orange Bang, Inc. ("Orange Bang"). Indeed, at the time that Entourage began registering the Disputed Assets, the Debtors were in the midst of litigation with Monster and Orange Bang concerning the Debtors' use of the Bang Assets.

5.      That litigation arose from the fact that the Debtors never owned the right to use the word "Bang" that they emblazoned on the front of every can of Bang energy and that had become synonymous with the Debtors' business. Instead, a family-owned business called Orange Bang owns the trademark to the word "Bang" on beverages. For more than fifty years, Orange Bang has been continually using the "Bang" mark on its own premium, flavored drinks. Orange Bang's trademarks include, without limitation, U.S. Trademark Registration Nos. 3,960,381, 1,223,619, and 1,224,457 (collectively, "Orange Bang's Trademarks").

6.      In June 2020, Monster and Orange Bang brought an arbitration against Debtor Vital Pharmaceuticals, Inc. ("VPX") for infringing Orange Bang's Trademarks and breaching a prior settlement agreement concerning those marks (the "Arbitration"). VPX's affiliate, Debtor JHO Intellectual Property Holdings, LLC ("JHO"), was subsequently made part of the Arbitration after Monster and Orange Bang learned that VPX had transferred ownership of the Bang Assets to JHO, which licensed them back to VPX. As part of the Arbitration, Monster and Orange Bang sought damages for trademark infringement and an injunction precluding VPX and JHO from using the Bang name in connection with any of the Debtors' products, including Bang energy.

- 3 -

7.    Monster and Orange Bang ultimately prevailed on all claims in the Arbitration, securing a nearly $185 million judgment against VPX and JHO, as well as a permanent injunction enjoining VPX and JHO's use of the Bang name.

8.    During the pendency of the Arbitration, the Debtors (at the direction and control of John H. Owoc, the Debtors' owner and former CEO) devised a scheme to register trademarks identical to the Bang Assets in the name of a newly formed entity that was not a party to the Arbitration. In doing so, the Debtors and Mr. Owoc hoped to hide the Debtors' assets from Monster and Orange Bang and immunize the trademarks used in the Debtors' business from, among other things, the permanent injunction that Monster and Orange Bang sought in the Arbitration. The Debtors and Mr. Owoc's scheme proceeded as follows:

9.    In August 2020, Mr. Owoc formed two new entities: Debtor Quash Seltzer, LLC ("Quash") and Entourage. Mr. Owoc owned and controlled both entities. Through Quash, the Debtors launched a hard seltzer beverage, which was branded Bang Mixx Hard Seltzer ("Bang Mixx"). The Bang Mixx can, label, and packaging featured the same stylized "Bang" name and signature "b" logo as the Debtors' Bang energy drink. While Quash led the commercial efforts to manufacture, distribute, market, and ultimately sell Bang Mixx, the Debtors' employees filed the U.S. trademark, copyright, and patent applications that are the subject of this action in Entourage's name rather than in the name of the Debtors.

10.    During the trademark application process, the USPTO flagged Entourage's applications as confusingly similar to the Debtors' Bang Assets. For example, in examining Entourage's application for the "Bang" name, the USPTO expressly noted that the Debtors already held the registration for the "identical" mark. As the USPTO aptly stated: "These marks are identical in appearance, sound, and meaning, and have the potential to be used . . .

- 4 -

in exactly the same manner. Additionally, because they are identical, these marks are likely to engender the same connotation and overall commercial impression when considered in connection with applicant's and registrant's respective goods. Therefore, these marks are confusingly similar." The USPTO further found that the goods at issue—alcohol and energy drinks—are "related or complementary in use, and thus, registration must be refused for likelihood of confusion."

11.    Similarly, in examining Entourage's application for a "stylized B" mark, the USPTO found that the Debtors already held the registration for "the same stylized B" and "[t]herefore, these marks are confusingly similar." The USPTO further stated that the goods at issue—alcohol and energy drinks—are "sufficiently related such that confusion would be likely if they are marketed under the same or similar marks." Although the USPTO initially refused to register the mark on this basis, Defendant falsely represented to the USPTO that there would be no confusion because Entourage owned the registrations for the Debtors' "b" marks. Relying on that fraudulent representation, the USPTO granted Entourage's application.

12.    The fraud did not stop there. Just days before the Arbitration hearing, the Defendant and the Debtors crafted sham agreements to paper their fraud. Specifically, on September 22, 2021, Defendant and JHO to enter into a so-called "Consent to Use and Co-Existence Agreement" pursuant to which they falsely declared that there was no likelihood of confusion between Entourage and JHO's use of identical marks (the "Co-Existence Agreement"). One week later, on September 29, 2021, Defendant entered into a Trademark License Agreement that granted Quash a license to use the marks (the "License Agreement"), confirming that Defendant always intended the marks to be used in the Debtors' business.

- 5 -

13.     Defendant and Mr. Owoc's actions were all part of an attempt to deceive and defraud Monster and Orange Bang, and to defeat, hinder, or delay the relief that Monster and Orange Bang sought in the Arbitration, including damages for trademark infringement and imposition of a permanent injunction enjoining VPX and JHO's use of the Bang mark.

14.     Plaintiff now brings this action seeking (i) a declaration that the Disputed Assets transferred to Plaintiff as Purchased Assets in the Sale and that Entourage has no right to register the Disputed Assets; and (ii) an order directing the USPTO to cancel Entourage's fraudulently obtained registrations of the Disputed Assets pursuant to 15 U.S.C. § 1064.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).

16.     The Sale Order also expressly provides that this Court has jurisdiction over this adversary proceeding: "This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b), to, among other things (i) interpret, implement, and enforce, the terms and provisions of this Sale Order, the Asset Purchase Agreement, the Transaction Documents, and any amendments thereto and any waivers and consents given thereunder; (ii) compel delivery of the Purchased Assets to the Buyer; (iii) compel performance of obligations owed to the Debtors; (iv) resolve any disputes related to the Transaction Documents; (v) compel delivery of any waivers, releases, or other related documentation reasonably requested by the Debtors or the Buyer to evidence the release of any Interests in the Purchased Assets; (vi) enforce the injunctions and limitations of liability set forth in this Sale Order; (vii) enter any orders under sections 363 and 365 of the Bankruptcy Code with respect to the Assumed Agreements and Assumed Real Property Leases; and

- 6 -

(viii) consistent with this paragraph, any action commenced against the Buyer relating to any of the above or relating to the liability of the Buyer with respect to the Purchased Assets shall be commenced before this Court." (ECF No. 1654 ¶ 48).

17.     Venue is proper under 28 U.S.C. § 1409(a). This adversary proceeding is related to the above-captioned chapter 11 cases (the "Chapter 11 Cases"), which are pending in this Court.

18.     This adversary proceeding is commenced pursuant to:

(a)     Rule 7001(7) of the Bankruptcy Rules, which allows for a proceeding to "obtain an injunction or other equitable relief";

(b)     Rule 7001(9) of the Bankruptcy Rules, which allows for a proceeding to "obtain a declaratory judgment relating to any of the foregoing";

(c)     11 U.S.C. § 542, which allows for the Debtors to recover property of their estates; and

(d)     11 U.S.C § 105(a), which allows this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" title 11 of the United States Code (the "Bankruptcy Code").

19.     Declaratory relief is appropriate pursuant to both Rule 7001 of the Bankruptcy Rules and 28 U.S.C. §§ 2201-02 (the "Declaratory Judgment Act").

20.     As set forth below, an actual legal controversy exists with respect to the declaratory relief requested herein.

21.     Pursuant to Rule 7008 of the Bankruptcy Rules, Plaintiff consents to the entry of a final judgment or order with respect to this Complaint if it is determined that this Court

- 7 -

6473196

would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## PARTIES

22.    Plaintiff Blast Asset Acquisition, LLC is a Delaware corporation with its principal place of business at 1 Monster Way, Corona, California 92879.

23.    Defendant Entourage IP Holdings, LLC, is a Florida limited liability company with its principal place of business at 1600 N. Park Drive, Weston, Florida. Entourage is owned by Mr. Owoc.

## FACTUAL BACKGROUND

### I.    MONSTER AND ORANGE BANG'S TRADEMARK INFRINGEMENT ARBITRATION AGAINST VPX AND JHO

24.    Mr. Owoc and his affiliated entities have a long history of trampling on the trademark rights of others. In 2008, VPX began unlawfully selling a pre-workout beverage under the name "Bang," ignoring that Orange Bang has been the exclusive owner of the "Bang" word mark on beverages since 1971. For over five decades, Orange Bang has used the name "Bang" prominently in its corporate title and trade names and to identify its premium flavored drinks.

25.    To protect its trademark rights, in September 2009, Orange Bang brought an action against VPX in the United States District Court for the Central District of California (the "California District Court") for, among other claims, trademark infringement under the Lanham Act.

26.    In August 2010, Orange Bang and VPX resolved that litigation in a settlement agreement (the "Settlement Agreement"), which set forth specific, limited ways in which VPX could use the Bang name. Among other things, the Settlement Agreement provided that VPX could use the Bang name to market and sell "nutritionally fortified," "creatine-

- 8 -

based" dietary supplement and nutritional products. The Settlement Agreement further provided that VPX could use the Bang name to sell products that are not creatine-based, but only under certain conditions not relevant here.

27.     Following the settlement, VPX dramatically expanded its Bang product line and the marketing of those products. By 2019, VPX escalated its unauthorized use of the name "Bang" rebranding the entire company to "Bang Energy." Around the same time, Orange Bang discovered that VPX was breaching the Settlement Agreement by selling products under the name "Bang" that did not even purport to contain creatine or comply with the restrictions on the sale and marketing of non-creatine-based products.

28.     In June 2020, Orange Bang and Monster—to whom Orange Bang had assigned certain rights under the Settlement Agreement—initiated the Arbitration against VPX. JHO was added to the Arbitration after Monster and Orange Bang learned that VPX had transferred ownership of the Bang Assets to JHO. Monster and Orange Bang alleged, among other things, that VPX and JHO infringed Orange Bang's Trademarks and breached the Settlement Agreement.

29.     In April 2022, the arbitrator issued a 177-page final award, finding in favor of Monster and Orange Bang and against VPX and JHO on all claims. The arbitrator awarded Monster and Orange Bang $175 million in damages attributable to VPX and JHO's infringement of Orange Bang's Trademarks. The award further provided for payment of attorneys' fees and costs (totaling approximately $9.3 million) and interest. The award also included a permanent injunction enjoining VPX and JHO's use of the Bang name. At Monster and Orange Bang's request, the arbitrator stayed the issuance of the permanent injunction, provided that VPX and JHO pay Monster and Orange Bang a 5% continuing royalty on sales of all products bearing the Bang name (the "Royalty").

- 9 -

30.    The California District Court confirmed the Arbitration award and entered final judgment on September 29, 2022.

## II.    THE DEBTORS' SCHEME TO EXCLUDE THE DISPUTED ASSETS FROM THE ARBITRATION

31.    During the Arbitration, the Debtors and Mr. Owoc devised a scheme to hide the Debtors' intellectual property in a new entity in the hopes of shielding such assets from, among other things, the permanent injunction and other relief that Monster and Orange Bang sought in the Arbitration.

32.    Less than two months after the Arbitration began, the Debtors' employees, at Mr. Owoc direction, formed two new entities, Quash and Entourage—neither of which was a party to the Arbitration—to market and sell new Bang-branded products on behalf of the Debtors. Shortly thereafter, Mr. Owoc directed the Debtors' employees to file applications with the USPTO to register to Entourage trademarks and other intellectual property identical to the Bang Assets that the Debtors owned. Those marks included the Debtors' stylized "Bang" mark, signature "b" logo, and the names of Bang-energy flavors.

33.    In about April 2021, the Debtors, through Quash, launched a hard seltzer called Bang Mixx. The cans, labels, and packaging for Bang Mixx featured the same stylized "Bang" name, signature "b" logo, and flavor names as the Debtors' other beverages,



including Bang energy. Below is a side-by-side comparison of Bang energy and Bang Mixx:

34.     Meanwhile, in the Arbitration, Monster and Orange Bang served discovery asking for a list of all products marketed or sold under the Bang name. Although VPX's response initially failed to identity Bang Mixx, Monster and Orange Bang discovered the existence of Bang Mixx once the Debtors began advertising the product. When confronted with the omission of Bang Mixx from its discovery responses, VPX informed Monster that Bang Mixx was being sold by a different company and all but conceded it was part of a strategy to exclude Bang Mixx from the Arbitration:

> Bang Mixx – This product is a hard seltzer that contains alcohol. This product is sold by Quash Seltzer. As this product is an alcoholic beverage that did not exist at the time of the 2010 Settlement Agreement, and is manufactured by a company that was not a party to the 2010 Settlement Agreement between VPX and Orange Bang, **VPX asserts that this product does not fall within the ambit of that agreement, and should not be included in this dispute**.

35.     Monster and Orange Bang repeatedly demanded information relating to Quash and its use of the Bang Assets on Bang Mixx. Although the arbitrator ordered production of responsive documents, VPX represented that no such documents existed.

36.     Mere days before the Arbitration hearing, however, VPX suddenly produced the Co-Existence and License Agreements. Pursuant to the Co-Existence Agreement, JHO purportedly consented to Entourage's registration of the Disputed Assets, despite such marks being identical to JHO's Bang Assets. The License Agreement then gave Quash a license to use the Disputed Assets on Bang Mixx and other alcoholic products. Both agreements were entered into for no discernable consideration and were signed by *VPX employees*—not employees of the parties to the agreements. VPX's in-house counsel signed the agreements on behalf of both JHO and Entourage, even though he was not employed by

- 11 -

either entity. Mr. Owoc, VPX's CEO, signed the License Agreement on behalf of Quash. These circumstances make clear that the agreements, and any others like them, were part of an attempt to evade liability for trademark infringement by putting the Disputed Assets and Bang Mixx in the names of entities that were not parties to the Arbitration.

37.    Not only did the Debtors and the Defendant attempt to hide the Disputed Assets from Monster but they also defrauded the USPTO in the process. Even though the Disputed Assets are identical to JHO's Bang Assets, the Defendant falsely represented to the USPTO that Entourage had the exclusive right to use the stylized "Bang" logo, signature "b" logo, and copyrighted flavor names. Indeed, on every trademark application, Entourage falsely represented the following under penalty of perjury:

> To the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive.

38.    Notwithstanding the foregoing misrepresentations, the USPTO flagged Entourage's applications for certain marks, including the "Bang" and "b" logos, as confusingly similar to the Debtors' Bang Assets. After the USPTO initially refused to register the marks, Defendant doubled down on its false representations. Defendant told the USPTO that there would be no confusion because Entourage owned the Debtors' marks. This was not true, as the marks were registered to JHO.

39.    Relying on Defendant misrepresentations, the USPTO granted Entourage's registration of certain of the Disputed Assets.[3]

---

[3] Entourage's applications for other Disputed Assets remain pending, including due to oppositions Orange Bang filed with the USPTO. The USPTO stayed Orange Bang's opposition proceedings until final determination of the Arbitration. Plaintiff expects the USPTO to lift the stay given that VPX and JHO recently dismissed their appeal of

40.     Contrary to the Defendant's representations to the USPTO that there would be no confusion between JHO and Entourage's use of identical marks, the Debtors and the Defendant made no distinction between the companies or the marks when advertising Bang Mixx. To the contrary, the Debtors actively marketed Bang Mixx as having been created by the Debtors. Below is an example of the product's packaging specifically stating that Bang Mixx was created "by the makers of Bang":



41.     Even Mr. Owoc marketed Bang Mixx as having been created by the Debtors. Below are examples of social media advertising from the BangEnergy.CEO Instagram account proudly proclaiming that Bang Mixx was created by the makers of the "legendary" and "world-famous Bang Energy":

---

the Arbitration, and the Judgment is now final.

 bangenergy.ceo ✓ The MIXX™ is a brilliant NEW hard seltzer innovation by the makers of the legendary Bang Energy. It is a delicious, crisp, and refreshing carbonated beverage that will bathe your taste buds in bliss. Containing 5% alcohol by volume, The MIXX™ is the perfect end of day or late-night sensation!

The Bang Mixx hard seltzer is revolutionary because of what Bang Energy CEO, Jack Owoc refers to as "Flavor and Function™" powered by three key electrolytes and only 100 calories and zero sugar!
Get in The MIXX™ today!

 bangenergy.ceo ✓ 🎉GET IN THE MIXX™ 🔵🔵

THE MIXX™ IS IN! 🍾The makers of the world-famous Bang Energy drink are launching a BANG HARD SELTZER with NATURAL flavors! The BANG MIXX is your #celebration fix! 🎉 🍾

@BangMixx hard seltzer is formulated with the same SUPER DELICIOUS #BangEnergy FLAVORS with NO caffeine plus 5% alcohol all in one!

## III.    THE DEBTORS' OWNERSHIP OF THE DISPUTED ASSETS

42.    Until the Sale to Plaintiff, the Debtors marketed and sold a variety of beverages and related products, including their leading product, Bang energy drink. The Debtors and their non-debtor affiliates operated as an integrated business with common ownership and control. The Debtors and all relevant non-debtor affiliates were inextricably intertwined, sharing employees, office space, capital, creditors, revenue, cash management systems, operational systems, and research and development. Mr. Owoc is the sole owner of each Debtor and all relevant non-debtor affiliates, including Entourage.

43.    Until Mr. Owoc's termination as the Debtors' CEO in March 2023, Entourage relied wholly on the employees, capital, operations, and cash, among other things, of the Debtors. Indeed, Entourage did not have its own employees. VPX employed all employees who performed work for and on behalf of Entourage.

44.    Entourage did not create, develop, design, or fund any of the Disputed Assets. Indeed, that would have been impossible as Entourage had none of its own employees. Instead, the Debtors and their employees performed and funded all work in connection with the Disputed Assets. The Debtors created the Disputed Assets for the purpose of using such assets in connection with the Debtors' goods.

- 14 -

45.     Rather than having the Disputed Assets registered to JHO (which would have been consistent with previous practice), Mr. Owoc, as the Debtors' then-CEO and sole owner, directed the Debtors' employees to file applications for the Disputed Assets in Entourage's name in an attempt to shield the Disputed Assets from the Arbitration. The Disputed Assets mirror the intellectual property that the Debtors had been using for over a decade before the Defendant's fraudulent attempt to register the Disputed Assets to Entourage.

46.     Even though Mr. Owoc directed that the Disputed Assets be registered under the name of Entourage, the Defendant never intended that it would produce products that used any of the Disputed Assets. Instead, Quash would use the Disputed Assets to produce, market, and sell various alcoholic beverage products, including Bang Mixx. To that end, Entourage entered into the License Agreement that granted Quash a license to use the marks, confirming that Defendant always intended the marks to be used in the Debtors' business.

47.     The Disputed Assets were, at all times, used by, and for the ultimate benefit of, the Debtors' business. Entourage never produced, marketed, or sold any products using the Disputed Assets. Entourage also has never undertaken a single act to associate the Disputed Assets with any good or service, or otherwise to give the Disputed Assets any independent value. All such work was done by the Debtors.

48.     The Debtors paid for all expenses associated with applying for, registering, and maintaining the Disputed Assets. The Debtors paid for the applications and upkeep of the trademarks filed in Entourage's name, and these expenses were booked in the Debtors' books and records as regular business expenses, i.e., payments made in the ordinary course,

not as any kind of distribution or personal payment made on behalf of Mr. Owoc to Entourage.

49.     In December 2020, the Debtors began developing a network to distribute and sell Bang Mixx by engaging in negotiations with various distributors. Entourage did not, and could not, engage in any such discussions, as it had no employees. Since the launch of Bang Mixx, the Debtors, through Quash, made commercial use of the Disputed Assets. Even though the Disputed Assets were registered to Entourage, all revenue stemming from the sale of Quash's products flowed to Debtors (including Quash). No funds or other monies from the sale of the Debtors' products that used the Disputed Assets were allocated to Entourage.

50.     In light of the foregoing, the Disputed Assets properly belonged to the Debtors and were included among the Purchased Assets that Plaintiff bought in the Sale. Entourage's purported registration of the Disputed Assets was nothing more than a scheme to hide certain of Debtors' intellectual property from Monster and Orange Bang, and to keep it out of the Arbitration.

## IV.   THE CHAPTER 11 CASES AND TRANSFER OF THE DISPUTED ASSETS TO PLAINTIFF

51.     On October 10, 2022, each of the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors' Chapter 11 Cases are being jointly administered. Entourage is not a debtor in these Chapter 11 Cases.

52.     The Debtors are operating their business and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

53.     From the petition date through the Sale, the Debtors paid Monster and Orange Bang the Royalty on post-petition sales of all products bearing the Bang name, including products featuring the Disputed Assets (i.e., Bang Mixx). The Royalty on pre-petition sales

- 16 -

of all Bang products, including those featuring the Disputed Assets, is included in the allowed general unsecured claim in favor of Monster and Orange Bang that the Bankruptcy Court approved as part of the Sale Order.

54.     On July 14, 2023, the Court entered the Sale Order, and on July 31, 2023, the Debtors completed the Sale of substantially all the Debtors' assets, including the Disputed Assets, to Plaintiff.

## COUNT I

### Declaratory Judgment

55.     The allegations set forth in paragraph 1 through paragraph 54 are incorporated by reference as if set forth fully herein.

56.     Plaintiff contends that it owns the Disputed Assets because the Debtors transferred ownership of the Disputed Assets to Plaintiff as part of the Sale.

57.     Plaintiff further contends that Defendant has no right to register any of the Disputed Assets.

58.     Prior to the Sale, the Debtors were the rightful owners of the Disputed Assets. The Debtors used the Bang Assets constituting the Disputed Assets for over a decade, on a wide variety of beverages and related products. Any use of the Bang Assets on alcoholic beverages was related to Debtors' longstanding use of the Bang Assets on various types of beverages and related products, as consumers would have reasonably expected the Disputed Assets to originate from the Debtors. Additionally, the Debtors created, designed, and funded the Disputed Assets for use in one of the Debtors' new product lines, and the Disputed Assets were associated entirely with, and derived their value entirely from, the Debtors' business.

- 17 -

59.     The Defendant asserts that the Disputed Assets are not the property of Plaintiff or the Debtors. The Defendant further asserts that it has the right to register the Disputed Assets.

60.     Thus, an actual legal and substantial controversy exists as to whether Plaintiff is the rightful owner of the Disputed Assets and whether the Defendant has the right to register the Disputed Assets.

61.     Pursuant to 15 U.S.C. § 1119, the Court "may determine the right to registration [of a trademark]."

62.     This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

63.     The Debtors are entitled to a declaratory judgment that Plaintiff owns, and is therefore entitled to control over, the Disputed Assets and that Defendant has no right to register the Disputed Assets.

## <u>COUNT II</u>

**Cancellation of Trademark Registration Pursuant to 15 U.S.C. § 1064(3)**

64.     The allegations set forth in paragraph 1 through paragraph 54 are incorporated by reference as if set forth fully herein.

65.     Pursuant to 15 U.S.C. § 1064(3), a petition to cancel registration of a mark may be made at any time if its registration was obtained fraudulently.

66.     Between August 10, 2020 and January 31, 2022, the Defendant, at the direction of Mr. Owoc, filed applications for the Disputed Assets. The Disputed Assets are identical to the Bang Assets that the Debtors owned and included the Debtors' stylized "Bang" mark, signature "b" logo, and the names of Bang energy flavors.

6473196

67.     Even though the Disputed Assets are identical to the Debtors' Bang Assets, the Defendant falsely represented to the USPTO on every application that it had the exclusive right to use the Disputed Assets. The Defendant also falsely told the USPTO that there would be no confusion because it owned the Debtors' marks. This was not true, as the marks were registered to JHO. The Defendant also falsely declared that there was no likelihood of confusion between Entourage's and JHO's use of identical marks.

68.     The Defendant knew the foregoing representations were false. The Defendant further knew that the Debtors were the rightful owners of the Disputed Assets and intended the Disputed Assets to be used exclusively in the Debtors' business.

69.     On July 31, 2023, the Debtors sold the Bang Assets and the Disputed Assets to Plaintiff in the Sale. Plaintiff currently markets and sells products, including Bang energy, using the Bang Assets. Accordingly, the Defendants' registration of the Disputed Assets, which are confusingly similar to the Bang Assets, is damaging and will continue to damage Plaintiff. The Defendant's use in commerce of the Disputed Assets also would infringe the Bang Assets by causing consumer confusion as to the source or origin of the goods or services on which the Disputed Assets are used and as to the affiliation, connection, or association of the Defendant with Plaintiff.

70.     Because the Defendant's registration of the Disputed Assets was obtained by fraud, and the statements provided to the USPTO in connection with the Disputed Assets were fraudulent, the registrations are subject to cancellation pursuant to 15 U.S.C. § 1064(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

- 19 -

(a)     a declaratory judgment that the Disputed Assets are the property of Plaintiff and that the Defendant has no right to register the Disputed Assets;

(b)     an order directing the USPTO to cancel the Defendant's registrations of the Disputed Assets; and

(c)     such other and further relief as the Court deems just and proper.

Dated: October 26, 2023                                    Respectfully submitted,
       Ft. Lauderdale, Florida

                                              /s/  Michael I. Goldberg

                                          **AKERMAN LLP**
                                          Michael I. Goldberg[4]
                                          Florida Bar No. 886602
                                          Eyal Berger
                                          Florida Bar No. 11069
                                          201 East Las Olas Boulevard, Suite 1800
                                          Fort Lauderdale, FL 33301
                                          T: (954) 463-2700 /F: (954) 463-2224
                                          michael.goldberg@akerman.com
                                          eyal.berger@akerman.com

                                          -and-

---

[4] Eyal Berger certifies that the following attorneys have applied to appear *pro hac vice* in this matter as follows: (i) Allison Libeu [Adv. ECF 14]; (ii) Yegor Fursevich [Adv. ECF 15]; and (iii) Stephen Andrews [Adv. ECF 16].

- 20 -

**HUESTON HENNIGAN LLP**
Allison L Libeu (*pro hac vice pending*)
Yegor Fursevich (*pro hac vice pending*)
Stephen D. Andrews (*pro hac vice pending*)
523 W. 6th St. Unit 400
Los Angeles, CA 90014
(213) 788-4340
alibeu@hueston.com
yfursevich@hueston.com
sandrews@hueston.com

*Counsel to Blast Asset Acquisition LLC*

- 21 -

6473196

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the forgoing was served via CM/ECF Notice of Electronic Filings to all parties registered to receive electronic noticing in this case on October  26, 2023.

<div style="margin-left:40%">

Respectfully submitted,

By: /s/   *Michael I. Goldberg*
Michael I. Goldberg, Esq.
Florida Bar No. 886602
michael.goldberg@akerman.com
**AKERMAN LLP**
201 East Las Olas Blvd., Suite 1800
Fort Lauderdale, FL 33301-2999
Tel: 954-463-2700
Fax: 954-463-2224

</div>

- 22 -

6473196